FILED

2005 Aug-10  AM 07:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **KATHY MURPHY;** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **CV–03-VEH-1441-NE** |
| | ) | |
| **UNUM LIFE INSURANCE** | ) | |
| **COMPANY** | ) | |
| **OF AMERICA; CAS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### Memorandum of Opinion

## I.   INTRODUCTION

This is a civil action filed by the Plaintiff, Kathy Murphy, against the Defendant, Unum Life Insurance Company of America ("Unum"), and CAS, Inc. ("CAS").  The Complaint alleges one count of violation of the Employee Retirement Income Security Act of 1974 (ERISA).

The case is presently before the Court on the Motion for Summary Judgment of Defendant Unum. (Doc. 20)[1].  For the reasons stated herein, the Motion will be **GRANTED**.

## II.   STANDARD OF REVIEW

---

1 On July 13, 2005, the Court entered judgment in favor of CAS.

> In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir. 2004).

## III.    FACTS[2]

### A.    Background Information on the CAS Plan

Plaintiff began working for CAS in 1987.  CAS afforded group long-term disability insurance coverage to its full-time employees.  The plan issued to CAS bears Group Policy No. 378609 001.  As a full-time employee of CAS, Plaintiff was afforded disability insurance under an employee welfare benefit plan issued by Unum Life and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*.

### B.    Key Disability Policy Provisions

The Policy affords discretionary authority to Unum Life to make claims decisions:  "When making a benefit determination under the policy, UNUM has

---

[2]The facts herein are presented, as the Court must, in the light most favorable to the nonmoving party.

discretionary authority to determine your eligibility for benefits and to interpret the

terms and provisions on the policy."  The Policy provides coverage for "disability,"

defined in relevant part as:

> You are disabled when UNUM determines that:
>
> - you are **limited** from performing the **material and substantial duties**
> of your **regular occupation** due to your **sickness** or **injury**; and
> - you have a 20% or more loss in your **indexed monthly earnings** due
> to the same sickness or injury.
>
> After 60 months of payments, you are disabled when UNUM determines
> that due to the same sickness or injury, you are unable to perform the
> duties of any gainful occupation for which you are reasonably fitted by
> education, training or experience.

*Amendment No. 3, to Group Policy No. 378609 001*, at LTD-BEN-1.  The Policy

defines the term "disability" for the purpose of clarifying the conditions which will

make a person eligible to receive benefits under the policy.  *Affidavit of Nancy Smith*,

at 2.

The Policy defines "limited" as "what you cannot or are unable to do."   The

Policy also defines "material and substantial duties" as duties that "are normally

required for the performance of your regular occupation; and cannot be reasonably

omitted or modified." The Policy defines "regular occupation" as "the occupation you

are routinely performing when your disability begins.  Unum will look at your

occupation as it is normally performed in the national economy instead of how the

work tasks are performed for a specific employer or at a specific location." The Policy

defines "injury" as "a bodily injury that is the direct result of an accident and not related to any other cause."  The Policy defines "sickness" as "an illness or disease."

### C.    Unum Life's Claims Decisions

Unum Life's claims department investigates and evaluates claims to determine whether claimants meet the eligibility requirements set forth in the policy.  This ensures that Unum Life pays only those claimants who actually meet eligibility requirements and that the employer can provide disability coverage to employees at a cost that it can afford.  The decisions that Unum Life's claims employees make or recommend in connection with disability claims do not affect their pay, advancement within the company, or other privileges of employment in any way.

### D.    Plaintiff's Claim for Benefits

On September 24, 2001, Plaintiff completed her claim for long-term disability benefits.  On her claim form, she described her occupation as a system analyst.  On September 24, 2001, Dr. Thomas Kraus completed Plaintiff's attending physician's statement.  Instead of delineating restrictions and limitations, Dr. Kraus simply referred to a November 8, 2000, physical capacity evaluation (discussed below) for all such restrictions and limitations.

On October 9, 2001, CAS prepared Plaintiff's Employer's Statement, which lists her job title as a database analyst.  According to her employer, Plaintiff's job duties included planning, designing, implementing, and possibly maintaining

computerized databases, including database definition, structure, documentation, long-range requirements, operational guidelines, and protection.  CAS also noted, "Some travel has been required in the past, but not all positions require travel."

### E.    Unum Life's Initial Claim Investigation

As part of its investigation of Plaintiff's claim for benefits, on October 31, 2001, Unum Life contacted CAS by telephone.  CAS confirmed much of Plaintiff's occupational information in this telephone conversation.  CAS described Plaintiff's specific job as a weapons system analyst.  Most of her work was done at the company's office.[3]  The Defendant argues that the Plaintiff has traveled in the past, but that she did not have to travel to do her job.  The Plaintiff disputes this fact.  Both parties cite the same notes (made by Julie Payne) from a phone conversation between Julie Payne, lead disability benefits specialist at Unum, and Cindy Doty (CAS's representative).  Although this is not a "job description", the notes verify that there is "[s]ome travel but not everyone has to that does this job."  Defendant cites this statement for the proposition that the Plaintiff has traveled.  When viewed in the light most favorable to the Plaintiff, a reasonable inference from this statement is that *Plaintiff* had traveled as part of her job, but not everyone who did the job was required to do so.  The amount of travel is not clearly quantified.

_____

3 Plaintiff disputes this assertion but provides no evidentiary basis for doing so.  Plaintiff does provide the deposition of Julie Payne, but that is only cited for the proposition that the Plaintiff's employer knew she worked at other sites from time to time. The evidence is undisputed that *most* of the Plaintiff's work was done at the company's office.

CAS also informed Unum Life that CAS had offered to do anything to help Plaintiff stay on the job, including contacting the RAVE (Retaining A Valued Employee) vocational rehabilitation team. Although Plaintiff agreed to go to vocational rehabilitation, CAS received two different stories after Plaintiff stopped the rehabilitation – (1) Plaintiff said that vocational rehab could not help her; and (2) the vocational rehabilitation counselor said that Plaintiff said she could not work.

## F.    Medical Records and Information Submitted

During Unum Life's initial claim investigation, Plaintiff submitted various medical records. Those records reflect that on April 18, 2000, Dr. Morris Seymour, one of Plaintiff's treating physicians, treated Plaintiff for pain in her lower back. On April 18, 2000, Dr. Dr. Seymour performed a physical examination of the lumbar region of the Plaintiff's back. The record reveals the following entry:

> Patient is earnest and cooperative with exam. No evidence of symptom amplification. Medium build. Exhibits average muscle development and erect posture. Gait is grossly normal. Able to dress and undress alone. Spine is without signs of trauma, masses, unusual hair or pigment. Surgical scars are noted at midline lumbar PSIS on right, and left ASIS. No deformity is noted of the shoulders, pelvis, knees, ankles, and feet. Normal lordosis is noted. Normal kyphosis is noted. No evidence of lumbar or thoracic scoliosis is noted. Knee heights are level. No Trendelenburg sign is noted. No tenderness is noted of the spinous processes, paraspinal region, SI joint, PSIS, CVA or trochanter. Lumbar ROM includes: Flexon is 90 degrees, extension is 20 degrees, right and left lateral bending is 30 degrees. Negative cross and straight leg raise bilaterally. No Kernig sign is noted. Patrick's testing is negative. Femoral stretch testing is negative. Hoover's test is negative. Bow string is negative. Leg lengths are equal. No quad of calf atrophy

is noted.  Motor strength is 5/5 bilaterally in the hip flexors, hip adductors, hip abductors, quad, hamstrings, anterior tib, EHL, and gastroc-soleus.  Sensation is intact to all dermatomes.  Proprioception is intact.  No clonus is noted.  Babinski test is negative bilaterally.  Knee and ankle jerks are 2/4 2/4 bilaterally.  No abnormal or femoral brults are noted.  DP and PT are normal bilaterally.  No lower extremity edema is noted.  No venous varicosities are noted in LE.  No Waddel signs are noted.

*UACL00086-87.*

The records Plaintiff submitted also include a physical capacity evaluation ("PCE") performed on Plaintiff on November 8, 2000.  Darlene Dailey, the Physical Therapist who performed the evaluation, wrote that "Patient describes her job as a system analysis."  *UACL0008*.  The physical therapist described Plaintiff's work positions for her job as including pushing, pulling, bending, squatting to get into a safe, traveling, meeting, preparing documents and presentations, taking notes, typing on a computer, cleaning equipment as well as putting equipment together for demonstrations, climbing into and out of a truck, as well as fingering, handling, reaching, throwing, kneeling, bending, standing, walking, running, bending, climbing, stooping, crouching, and twisting.  According to the evaluation, Plaintiff "received no restrictions."[4]   The physical therapist also made the following recommendations to Plaintiff:

-        Limit lifting to 13 lbs. on occasional basis, 6.5 lbs. on a more

---

4 Plaintiff disputes this contention.  However, in the reference cited by the Defendant the Plaintiff received no restrictions.  The Plaintiff's example of a statement from the PCE that "the above should be recommendations and not restrictions without physician's approval" only bolsters that point.

frequent basis from floor to shoulder height.

- Limit lifting to 15 lbs. on an occasional basis, 7.5 lbs. on a more frequent basis from 12" to waist.
- Limit carrying to 13 lbs. on an occasional basis, 6.5 lbs. on a more frequent basis.
- Limit overhead activity to an occasional basis.
- Limit stair climbing to an occasional basis.
- Limit ladder climbing to an occasional basis.
- Limit push/pulling to 18.8 lbs. of force on an occasional basis, 9.4 lbs. of force on a more frequent basis.
- Limit squatting to an occasional basis.
- Limit bending to an occasional basis.
- Limit sitting to 4 hours out of an 8-hour workday with breaks.
- Limit standing to 2-3 hours out of an 8-hour workday with breaks.
- Limit walking to 2 hours out of an 8-hour workday with breaks.

*UACL0005-6.*

In this same report, the physical therapist identifies Plaintiff's physician as Dr. Kraus. Unum employee Melanie Gass agreed, at her deposition, that Dr. Kraus submitted his medical opinion that Plaintiff "would qualify for long term disability and was unable to hold a productive job secondary to pain and discomfort." Ms. Gass also agreed that the physical therapist referred Plaintiff back to her treating physician for treatment. Ms. Gass agreed that Dr. Kraus concluded that the Plaintiff was disabled and that her ability to perform any type of employment was unlikely.

Dr. Kraus submitted a signed disability diagnosis letter to Unum describing Plaintiff's "severe intractable pain" from her "multiple surgical interventions"and stating that the Plaintiff is "disabled and that for her to perform any type of productive employment is highly unlikely". Dr. Kraus had diagnosed the Plaintiff as disabled

as early as September, 2001.  The physical therapist notes on UACL00005 that "[i]t should be noted that the above should be recommendations and not restrictions without physician's approval".  The physical therapist identifies Plaintiff's physician as Dr. Kraus.  In addition, Unum in-house doctor Lance Matheny issued a clinical finding that the "clinical information reviewed was consistent with impairment of the lumbosacral spine related to the previous L4-S1 fusion".  Dr. Matheny noted that "chronic pain management with valium and narcotic pain medication was noted" as well as the assessment that "the chronic pain is a reason for inability to return to work at this time."

### G.   Unum Life's Decision to Deny Plaintiff's Claim for Benefits

The Plaintiff completed a long term disability claim form on September 24, 2001, wherein she stated her occupation as "system analyst".  *UACL00012.*  She also stated on this form that the injury occurred at CAS, Inc. on July 25, 1988, when she "Fell down two flights stairs."  *Id.*  To the question "Why are you unable to work?", she answered "Failed back Snydrome [sic]/Hips (Bone site grafts/Severe Pain.[sic]" *Id.*  She stated that her current condition does not prevent her from caring for herself, and that the date she first became unable to work was April 13, 2001.  *Id.*

Unum Life reviewed all of the medical records received from Plaintiff and her

treating physicians and made its decision based on these records.[5]  As part of its determination that Plaintiff's condition did not render her unable to perform her regular occupation, Unum Life conducted both a vocational evaluation and a medical evaluation.

### 1.    Vocational Evaluation

On November 1, 2001, Unum Life performed a vocational evaluation on Plaintiff's job as it existed in the national economy and concluded that an accurate occupational description for Plaintiff's job was "Management Analyst" or "Systems Analyst."  Plaintiff's job in the national economy includes:  planning studies of work problems and procedures; gathering and organizing information; analyzing data gathered; developing information and considering available solutions; organizing and documenting studies; and conferring with personnel.  It also includes reviewing forms and reports;  developing  and  implementing  records  management  programs; interviewing personnel and conducting on-site observations; preparing manuals and training  workers;  designing,  evaluating,  recommending  and  approving  changes; recommending purchases of storage equipment and designing area layouts; planning studies of work problems and procedures; gathering and organizing information;

---

5 Plaintiff disputes this statement saying that it is based upon hearsay.  The Defendant contends that the rules of evidence do not apply to the claims administrator, so said claims administrator can rely upon hearsay in making its decision.  However, the Defendant misses the point.  This *Court* is bound by the rules evidence in what *it* can consider.   The Plaintiff, at this point  in the motion, takes issue with this one statement of fact made in the Motion for Summary Judgment, and supported by the affidavit of Ms. Smith, not with the claims administrator's decision as a whole.  However, the affiant states that she has personal knowledge of the fact stated.  It does not otherwise appear to be based upon hearsay.  The validity of the affidavit has not been challenged by the Plaintiff.   Accordingly, the statement stands.

analyzing data; documenting findings of studies; preparing recommendations for implementation of new systems; and conferring with personnel. The occupation occasionally includes reaching, handling, fingering, acuity, and accommodation. It frequently includes talking and hearing, but it does not include climbing, balancing, stooping, kneeling, crouching, or crawling. It may involve standing or walking for a brief period of time, but it mostly involves sitting. The job is classified as sedentary.

### 2. Unum Life's Medical Evaluations

Unum Life also conducted a medical evaluation of Plaintiff's claim. On December 7, 2001, Unum Life physical therapist Melanie Gass reviewed the medical records submitted by and on behalf of Plaintiff. After summarizing the records, Ms. Gass noted that Plaintiff was being treated by a pain management specialist who felt like she was unable to work due to pain and discomfort. *UACL00102*. Ms. Gass noted, however, that the pain management specialist has referenced the 11/08/00, FCE for restrictions. She also noted that said FCE "suggested a higher level of functional capacity than that indicated by Dr. Krause." *Id.*

Ultimately, Ms. Gass forwarded the claim to one of Unum Life's board certified orthopedic surgeons, Dr. Lance Matheny, for his review. On December 10, 2001, Dr. Matheny prepared his physician response after reviewing the medical records provided. On December 12, 2001, he wrote:

I have reviewed the file of Kathy L. Murphy, a 44 year old

database/system analyst with a history of low back pain complaints. A summary of the history was noted above. The clinical information reviewed was consistent with impairment of the lumbosacral spine related to the previous L4-S1 fusion. Strictly from an orthopedic standpoint, general restrictions and limitations can include repetitive bending or twisting, extreme or unusual positioning, static positioning, prolonged sitting, standing, or walking, and some degree of lifting, pushing, and pulling restriction. Changing of position as needed would be likely. Chronic pain management with valium and narcotic pain medication was noted, as well as the assessment that the chronic pain is a reason for inability to work at this time. Assess of the file from a physiatry standpoint may help clarify the pain issues. The FCE report was noted, but the assessment of function as of November 2000 would seem to have little applicability currently, especially in light of further spine surgery in July 2001.

*UACL00105*. Ultimately, Dr. Matheny decided to refer the claim to a physiatrist to help clarify some of the issues. As a result, on December 21, 2001, Unum Life referred Plaintiff's claim to physiatrist Dr. Burton McDaniel, who is board certified in physical medicine and rehabilitation.

Notes from Dr. McDaniel, dated January 28, 2002, state:

Kathy L. Murphy is a 44 year old Database/System Analyst whose file was reviewed with special attention to pain and/or pain medications as a limiting factor. Claimant's file is limited in regards to documentation of recent medications being taken and the number. Dr. Randall's 7-26-01 note includes: ". . . MEDICATIONS: MS-Conin, Percocet, Valium, Ambien . . . " without documentation of dosages. Claimant appears to continue on similar medications after her surgery without specific documentation of side effects. Walk-in review of file was also performed. Telephone contact was made to claimant's Attending Physician's office. Office clarified current medications which have changed very little from their first interaction with claimant. No restrictions of driving have been given. CONCLUSION: Attending's office agrees with restrictions of previous FCE which would support

sedentary work.

*UACL00109.*

## H.    Unum Life's Initial Claim Decision

Unum Life wrote Plaintiff on January 28, 2002, to inform her that it could not approve her claim for benefits.  The letter detailed some of the provisions of the policy, including the definition of "disability," and it discussed Unum Life's medical and vocational findings.

## I.    Plaintiff's Appeals and Unum Life's Additional Reviews of Her Claim

### 1.    Additional Information Submitted by Plaintiff

On April 24, 2002, Plaintiff appealed Unum Life's denial of her disability claim. However, before doing so, Cathy Sanford, a physical therapist, performed another physical capacity evaluation on March 8, 2002.  Ms. Sanford noted that Plaintiff "provided *marginal maximal voluntary effort*" in the evaluation.[6]  Ms. Sanford recommended that Plaintiff only occasionally lift and carry 5 pounds, climb stairs, and reach above her shoulder.  Ms. Sanford also recommended that Plaintiff should not bend, squat, crawl, climb a ladder, work at unprotected heights, or work around moving machinery.  Plaintiff should also limit her standing to a total of four hours and walking to four hours out of an eight-hour workday.  Ms. Sanford further

_____

6 The Plaintiff disputes these statements from the report with statements from the previous PCE and statements from Ms. Gass and Dr. Kraus regarding Plaintiff's ability to work.

recommended appropriate breaks and position changes.   After receiving this

information, Unum Life submitted Plaintiff's claim for additional medical and

vocational evaluations.

### 2.    Unum Life's Additional Medical Evaluations

On May 15, 2002, physical therapist Melanie Gass re-reviewed Plaintiff's

claim, including the March 8 physical capacities evaluation, and again referred the

claim to Dr. McDaniel.[7]   On June 4, 2002, Dr. McDaniel re-reviewed Plaintiff's

claims and wrote the following:

> Kathy L. Murphy is a 44 year old Database/System Analyst whose file
> was re-reviewed with special attention to information received since last
> reviewed.   Claimant's April 24, 2002 letter to UnumProvident
> documents medication dosages of MS Contin and Ambien which exceed
> dosages supported by documentation in current file.  Physical Capacity
> Evaluation dated March 8, 2002 (requested by claimant's AP) is limited
> in documentation of validity measures.  Physical Capacity Evaluation
> includes: " . . . Worker's current work level would be considered
> SEDENTARY . . . Based upon evaluation results and observation during
> testing, these results should be considered MARGINALLY valid and
> current best estimate of current physical capacities . . .".  Despite
> inconsistencies, examining Physical Therapist noted activities consistent
> with Sedentary work capacity.  No impaired cognition was documented
> during Physical Capacity Evaluation.
>
> CONCLUSION: 1.  Current information would not change conclusion

---

7 The Plaintiff disputes this fact saying that "Ms. Gass agreed that the physical therapist never forms any medical opinion and
never found that the Plaintiff could ever return to work."  The Plaintiff also disputed this claim "as to the reasonableness of
Unum's failure to further consult Dr. Matheny for additional orthopedic review or Dr. Kraus for pain management consultation."
These "disputes" appear to have absolutely nothing to do with the factual statement made by the Defendant in the first place.
Despite the fact that the Court is under an obligation to view the facts in the light most favorable to the non-movant (here the
Plaintiff), the Plaintiff, in response to most numbered facts, does not provide an actual response to the specific fact raised.
Accordingly, while the Court feels obliged to note, at times, the Plaintiff's objections, the Plaintiff, for the most part, has not
demonstrated a version of the facts different from that illustrated by the Defendant.

of 1/28/02 review. 2. Reasonable R & L's would be Sedentary work level, no repetitive trunk flexion, and no operation of machinery.

*UACL00133.*

### 3.    Unum Life's Additional Vocational Evaluation

Also on June 4, 2002, Unum Life had vocational rehabilitation consultant Tom Waymire review Plaintiff's claim.  Mr. Waymire wrote that "I have reviewed the file of Ms. Kathy Murphy.  She is a 44 year old database/system analyst with a diagnosis of low back pain with posterior fusion in 1989, followed by anterior fusion, and subsequent exploration of the fusion in July 2001." *UACL00137.*  He further writes:

> File referred to this vocational consultant to address if travel is a requirement for the occupation of systems analyst in the National Economy.  It appears that based upon a review of available information that the occupation as identified in the file is valid.  Ms. Murphy indicates that her particular job at CAS Inc. did require some travel, primarily by plane.  Note in the file also indicates that HR specialist at CAS Inc., Cindy Doty confirmed that their [sic] was some travel in Ms. Murphy' [sic] job at the company but that other system analyst positions existed which did not require travel.

> From a vocational standpoint the occupation of Management Analyst/Systems Analyst DOT Code 167.167-010 would be considered a sedentary type occupation and would not requirement [sic] travel as an essential or material duty of the occupation.

*UACL00137.*

### 4.    Unum's Decision on Appeal

Based on all of this information, on June 4, 2002, Unum Life notified Plaintiff that the new information she submitted was insufficient to reverse the previous

decision denying her claim. However, Unum Life also informed Plaintiff that it was forwarding her claim to its Quality Performance Support Unit for a final review and determination. Finally, on June 26, 2002, Unum Life's Quality Performance Support Unit sent Plaintiff a letter notifying her that it had completed the appellate review of her claim and that the decision to deny benefits was being upheld. In addition to outlining several key policy terms, the letter discusses the occupational analysis performed based on Plaintiff's occupation as it exists in the national economy and the physical capacity evaluation from March of 2002. Unum Life concluded that the information in Plaintiff's claim file simply did not support the restrictions and limitations that would prevent Plaintiff from performing her sedentary occupation. As a result, Unum Life determined that Plaintiff was not disabled as that term is defined in the policy.

## IV.   ANALYSIS

### A.   ERISA Review Standard

The Eleventh Circuit has held:

> ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Shaw v. Connecticut Gen. Life Ins. Co.,* 353 F.3d 1276, 1282 (11th Cir.2003); *Marecek v. BellSouth Telecomms., Inc.,* 49 F.3d 702, 705 (11th Cir.1995). But *Firestone* established three distinct standards for reviewing administrators' plan decisions: "(1) *de novo* where the plan does not grant the administrator discretion [*i.e.,* does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the

-16-

plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." *HCA Health Servs. of Georgia., Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001) (*quoting Buckley v. Metro. Life,* 115 F.3d 936, 939 (11th Cir.1997)); *Shaw,* 353 F.3d. at 1282.

* * *

## C. Application

* * *

But the distinctions between the heightened arbitrary and capricious, arbitrary and capricious, and *de novo* standards of review have become difficult to discern over time. Given the semantic imprecision that has seeped into this area, we first pause to clarify these concepts before attempting to apply them.

*De novo* review, which we employ in reviewing "no-discretion" plan decisions, offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision. In fact, we accord *no* deference there, since, no judgment/discretion was exercised in making the determination (*i.e.,* there is no discretion to which we would defer).

In contrast, where the administrator has discretion (*i.e.,* applies his own judgment) in making plan decisions, we review under the arbitrary and capricious standard (which is substantively the same as the "abuse of discretion" standard, *Shaw,* 353 F.3d at 1284-85 n. 6). We use it to avoid judicial second guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny).

Finally, where the administrator has discretion but exercises it under a conflict of interest, we apply "heightened arbitrary and capricious" review. There we apply a level of deference (and conversely, scrutiny) somewhere between what is applied under the *de novo* and "regular" arbitrary and capricious standards.

In *HCA,* we incorporated these varying levels of judicial review

-17-

in a multi-step approach. For clarity, we recapitulate that approach (240 F.3d at 993- 95) in a simpler version here, for use in judicially reviewing virtually *all* ERISA-plan benefit denials:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision;

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

We described "heightened arbitrary and capricious review" *supra* as somewhere between the *de novo* and "mere" arbitrary and capricious standards. But where is that "somewhere"?  Supreme Court decisions have not explained it. *See Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 390-94 (3rd Cir.2000). "[C]ircuit courts agree that a conflict of interest triggers a less deferential standard of review ... [but] .... differ over how this lesser degree of deference alters their review process." *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825 (10th Cir.1996).

Our circuit, at least in plan *interpretation* cases (unlike this, a *factual determination* case), has incorporated a two step, burden-shifting, approach:

(1) The claimant shows that the administrator of a discretion-vesting plan is conflicted.

(2) The administrator then proves that his plan interpretation was not tainted by self-interest.

*See Brown,* 898 F.2d at 1566.

A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant. *Id.* at 1566-67. But, if the administrator can demonstrate a routine practice or give other plausible justifications--such as benefitting the interests of other beneficiaries--judicial deference to it may be granted, since "[e]ven a conflicted [administrator] should receive deference when [he] demonstrates that [he] is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries." *Id.* at 1568.

*Williams v. BellSouth Telecommunications, Inc.* 373 F.3d 1132, 1134 -1139 (11th Cir. 2004).  The *Williams* Court, while deciding to "leave the issue to another day" as to whether the burden shifting framework should apply in fact shifting cases such as the instant case, did "proffer the . . . framework to assist future determinations".  *Id.*  Accordingly, while the reminder of the cited language above is binding precedent, the burden shifting analysis is dicta as far as fact determination cases such as the instant case are concerned.

**B.     The De Novo Standard Shows That the Decision of the Plan Administrator Was Not "Wrong"**

The Court must fist look to whether the Plan administrator's decision was wrong.

-19-

In order to receive long-term disability benefits, Plaintiff must be "disabled" as defined in the plan, which states in relevant part:

> You are disabled when UNUM determines that:
>
> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
>
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

The record does not support the Plaintiff's alleged inability to perform the "material and substantial duties" of her "regular occupation."

For example, records from Dr. Seymour dated April 18, 2000, show mostly normal examination without restrictions noted. *UACL00086-87.*  In addition, at the November 8, 2000, physical capacity evaluation, Plaintiff "received no restrictions," and the limitations placed on her allowed her to perform the duties of a sedentary occupation. *UACL00003-8.*

The Plaintiff places considerable weight on a letter written by Dr. Kraus, to Unum, on March 13, 2002, describing the Plaintiff's "severe intractable pain" from her "multiple surgical interventions" and stating that the Plaintiff is "disabled and that for her to perform any type of productive employment is highly unlikely". *UACL00120.*  Indeed, this is the only evidence the Plaintiff cites in her brief for the proposition that the denial was wrong.  While Dr. Kraus may have opined that

Plaintiff was "disabled", such a statement is as much a legal, as a medical, determination.  In addition, the fact that the letter was written to Unum, for the purpose of disability determination, and not diagnosis, should be taken into account. The letter also fails to state the last date of treatment, nor does it lay any type of acceptable foundation for the opinion that the Plaintiff could not perform "any type of productive employment".  In any case, said statement is inconsistent with Dr. Kraus's adoption, on September 24, 2001, of the restrictions and limitations from the November 8th physical capacity evaluation. *UACL0009-10.*  Accordingly, the Court gives little weight to the letter of Dr. Kraus.

Other evidence in the file is of considerable weight, however.  The Plaintiff, in her long term disability claim form dated September 24, 2001, stated that her occupation was "system analyst" and that her condition did not prevent her from caring for herself.  *UACL00012.*  A November 1, 2001, vocational evaluation on Plaintiff's job as it existed in the national economy concluded that an it was "Management Analyst" or "Systems Analyst".  The job is classified as sedentary.

A physiatry review done by Dr. McDaniel on January 28, 2002, agreed with the restrictions of the previous FCE and supported sedentary work. *UACL00109.*  On March 8, 2002, another physical therapist performed another physical capacity evaluation and again recommended some limitations which did not prohibit Plaintiff from performing a sedentary occupation.  *UACL00125-130.*  On June 4, 2002, Dr.

McDaniel re-reviewed the Plaintiff's claims after this second FCE and again found that reasonable restrictions and limitations would be sedentary work. *UACL00133.*

An additional vocational evaluation done by Mr. Waymire on June 4, 2002, found the Plaintiff's position to be sedentary. *UACL00137.*

The record demonstrates that (1) Plaintiff's regular occupation was sedentary and (2) her physical capacity allowed her to perform sedentary work. Based on this information, Unum life determined that Plaintiff did not satisfy the Policy definition of "disability." As a result, she is not eligible for long-term disability benefits, and Unum life's decision to deny those benefits was a legally correct interpretation of the policy provisions.

Because the Defendant's decision to deny benefits was de novo correct, the analysis under ERISA stops, and the Defendant is entitled to summary judgment. The Motion for Summary Judgment will be **GRANTED**.

## V.     CONCLUSION

For the above stated reasons the Motion for Summary Judgment is due to be **GRANTED**.

**DONE** this 10th day of August, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge